Wilkins, Douglas H.,J.
On July 30,2013, the Court held an initial hearing on the plaintiffs Prayer for Preliminary Injunction under Prayers 3, 4, 5[1] and 6 of the Verified Complaint (“Motion”), which the defendants oppose. It became apparent that the threshold issue in this case is whether the underlying dispute must be referred to an independent accountant pursuant to the corporate parties’ Asset Purchase Agreement (“APA”). Accordingly, the court decided, pursuant to Mass.R.Civ.P. 65(b)(2), to consolidate the Motion with a trial on the merits of the issue whether the dispute must be referred to an independent accountant pursuant to Section 2.3 of the APA — an issue which effectively resolves Count I.[2] The court heard testimony on September 13 and 16, 2013. Mark Bobseine and Thomas Seeman testified. The Court received 13 exhibits into evidence.
FINDINGS OF FACT
Stipulated Facts
By exchanging and responding to proposed findings of fact and by stipulating to the admissibility of certain exhibits, the Parties have agreed to the following undisputed facts, which the Court adopts as findings after trial.[3]
1. Plaintiff, Cutter Associates, Inc. (“Seller”), is a Massachusetts corporation which beginning in 1998 did business at 1099 Hingham Street, Suite 201, Rockland, Plymouth County, Massachusetts. As part of a 2012 sale-of-assets transaction between the parties, Seller agreed to use the name Elder Brewster Associates, Inc. from and after December 17, 2012.
2. Defendant Cutter Associates, LLC (“CA, LLC” or “Buyer”) is a Delaware limited liability company formed on November 28, 2012 to purchase assets of Seller, and which is now doing business since December 17, 2012 at 1099 Hingham Street, Suite 201, Rockland, Plymouth County, Massachusetts.
3. On December 17, 2012, CA, LLC paid in excess of $5.6 million dollars in cash to purchase the Seller’s assets. By and through the asset purchase, $3,645,600 was paid in cash to the Seller at closing and $563,000 was placed into an escrow account in support of the representations and warranties. An additional $1,424,448 was paid directly to the Principal Shareholder (Mark Bobseine) for his “personal goodwill.”
4. The terms of the sale were memorialized through a written APA, executed on or about December 17, 2012.
5. The closing date under the APA was December 17, 2012.
6. CA, LLC is headquartered in Rockland, MA. CA, LLC also has an office/subsidiary in London, England and a subsidiary in Canada. The parties agree that CA, LLC is the world leader in its niche and provides annual research subscriptions related to the software systems and operations of large asset and money managers. They also agree that CA, LLC’s customer list contains almost every major name that one could think of in the asset management world. Based on its expertise, which the company builds with its research, CA, LLC also offers consulting services to these same customers. CA, LLC has more than forty permanent employees and maintains a “cloud” of dozens of additional employees which the company accesses on an as-needed, project-by-project basis.
7. The sole Manager of CA, LLC is Thomas W. Seeman.
8. Section 2.3 of the APA reads as follows:
Closing Date Payment Adjustment
(a) On the Closing Date, the Seller shall cause to be prepared and delivered to the Buyer the Initial Closing Statement (as defined below) and a certificate based on such Closing Statement setting forth the Seller’s calculation of Closing Net Assets (as defined below). At Closing, Seller shall transfer to Buyer an amount equal to fifty percent (50%) of the cash held by the Seller in the United States as of the Closing Date. The closing statement (the “Initial Closing Statement”) shall present the Net Assets as of the end of business on the day prior to the Closing Date (“Closing Net Assets”). “Net Assets” means (i) Cash and Cash Equivalents, restricted cash, Accounts Receivable and prepaid expenses (ii) reduced by accounts payable included in the Assumed Liabilities, accrued expenses and other current liabilities, prepaid taxes, prepaid insurance and Deferred Revenue, in each case (A) if any and (B) as determined in accordance with the methodology used in preparing Seller’s audited balance sheet as of December 31, 2011 and with GAAP consistently applied (the “Agreed Principles”). ‘Target Net Assets” is $528,309. Set forth on Schedule 2.3(a) is a summary showing the calculation of Target Net Assets in accordance with the Agreed Principles. Net Assets shall be calculated after the payment of all transaction expenses attributable to Seller or the Principal Shareholder (including payments or expenses relating to other shareholders of the Seller), all back wages (including but not limited to any owed to the Principal Shareholder), any loans owed to shareholders, any accrued transaction related or stay bonuses being paid to employees, and any termination or settlement payments.
(b) As soon as reasonably practicable but in no event later than 60 days following the Closing Date, Buyer will deliver to Seller, in accordance with the notice provisions set forth in Section 11.2, a statement, which shall be prepared as of the Closing Date and which shall set forth the Buyers [sic] calculation of Net Assets as of the Closing Date (the “Actual Net Assets”), along with a detailed written explanation of its determination of the Actual Net Assets (“the Actual Closing Statement”).
(c) If the Seller disagrees with the Buyer’s calculation of Actual Net Assets delivered pursuant to Section 2.3(b), the Seller may, within 30 days after deliveiy of the Actual Closing Statement (the “Notice Period”), *141 deliver a notice to the Seller [sic: Buyer] stating that the Seller disagrees with such calculation and specifying in reasonable detail those items or amounts as to which the Seller disagrees and the basis therefor.
(d) If a notice of disagreement shall be duly delivered pursuant to Section 2.3(c), the Buyer and the Seller shall, during the 30 days following such delivery, use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Actual Net Assets. If during such period, the Buyer and the Seller are unable to reach such agreement, they shall promptly thereafter cause a mutually agreeable independent accounting firm (the “Independent Accountant”) to review this Agreement and the disputed items or amounts for the purpose of calculating Actual Net Assets (it being understood that in making such calculation, the Independent Accountant shall be functioning as an expert and not as an arbitrator). For purposes of this Section 2.3(c), the parties hereby agree that Grant Thornton LLP or BDO LLP shall be acceptable as the Independent Accountant. . . Each party agrees to execute, if requested by the Independent Accountant, a reasonable engagement letter. The Buyer and the Seller shall co-operate with the Independent Accountant and promptly provide all documents and information requested by the Independent Accountant.. .
(e) . . .
(f) If Final Net Assets exceed Target Net Assets, the Buyer shall pay to the Seller, as an adjustment to the Closing Date Payment, in the manner provided in Section 2.3(g), the amount of such excess and, if Target Net Assets exceed Final Net Assets, the Seller shall pay to the Buyer, as an adjustment to the Closing Date Payment, in the manner provided in Section 2.3(g), the amount of the such excess. “Final Net Assets” means Actual Net Assets (i) as shown in the Buyer’s calculation delivered pursuant to Section 2.3(b) ifno notice of disagreement with respect thereto is duly delivered pursuant to Section 2.3(c); or (ii) if such a notice of disagreement is delivered, (A) as agreed by the Buyer and the Seller pursuant to Section 2.3(d) or (B) in the absence of such agreement, as shown in the Independent Accountant’s calculation delivered pursuant to Section 2.3(d).
(g) Any payment pursuant to Section 2.3(f) shall be made . . . within Five Business Days after Final Net Assets has been determined by wire transfer ... of immediately available funds . . .
9.Section 11.2 of the APA reads as follows:
Notices
Any notice required or permitted by this Agreement shall be in writing and shall be deemed to have been given when delivered personally, or by courier, overnight delivery service, or the third Business Day after being deposited in the regular mail as certified with postage prepaid, if such notice is addressed to the person to be notified at such person’s address as set forth below, or as subsequently modified by written notice.
(a) If to the Buyer, to:
Cutter Associates, LLC
100 Highland Street
Weston, MA 02493
Attn: Tom Seeman, Manager
With a copy (which shall not constitute notice) to:
Mark J. Tarallo, Esquire
Morse, Barnes-Brown & Pendleton, PC CityPoint
Waltham, MA 02451
(b) If to the Seller (prior to the Closing):
Cutter Associates, Inc.
1099 Hingham Street
Suite 201
Rockland, MA 02370
Attention: Chief Executive officer
With a copy (which shall not constitute notice) to:
Josef B. Volman, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
(c) If to the Seller (after the Closing):
Cutter Associates, Inc.
c/o Mark Bobseine
39 Onion Hill Road
Duxbury, MA 02332
Attention: Chief Executive officer
With a copy (which shall not constitute notice) to:
Josef B. Volman, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
10. Section 11.3 ofthe APA provides that, “[t]he Buyer, on the one hand, and the Principal Shareholder and Seller, on the other, shall be responsible for their respective legal and other expenses in connection with this Agreement and the transactions contemplated hereby.”
11. The asset sale transaction was negotiated over eight months during 2012.
12. As it relates to Section 2.3, and by way of background, one of the assets a buyer purchases when it buys a company’s assets is the working capital of the business. In its simplest form, this amount could simply be the cash plus the accounts receivable, less the accounts payable.
13. However, because of accounting complications, often times it can take thirty to sixty days after the closing to determine what the working capital was on the closing date. To solve this dilemma, the parties to this transaction agreed to the amount of the working capital to be received by the Buyer as part of the purchased assets *142 and agreed that there would be a later payment to “true up” the value received by each party.
14. On or about February 27, 2013, Buyer delivered its Actual Closing Statement. The Buyer’s February 27, 2013, hand-delivered notice to the Seller states, “Section 11.2 also says that a copy should be delivered to Josef Volman of Burns & Levinson. At the request of the Seller and the Principal Shareholder, no copy will be delivered by the Buyer to Josef Volman. The parties agree that, notwithstanding the provisions of the APA, this is acceptable to them.”
15. At 10:30 and 10:47 a.m. on March 21, 2013, Bobseine sent emails to Seeman described more fully below.
16. Mr. Seeman’s March 21,2013 email to his accountant states the accountant should “not do any work on this until we receive their official notice as required by the Asset Purchase Agreement. I want to see what their official notice says rather than this preliminary email.”
17. As a result, on April 3, 2013, Buyer forwarded by wire transfer to the Seller the sum of $761,701. Also on April 3, 2013, Buyer wire transferred to Seller an additional $178,736.19 in funds because the Seller had accidentally paid certain liabilities assumed by Buyer under the terms of the APA.
18. On April 4, 2013, Buyer forwarded a letter to Seller. The contents of that letter are summarized below.
19. On April 10, 2013, Seller reversed (and thus returned) the $761,701 wire transfer made by Buyer to Seller on April 3, 2013.
B. Additional Facts
The Court finds the following additional facts by a preponderance of the credible evidence and, where applicable, the stipulation of the parties.
The working capital changes multiple times a day because if, for example, the company generates a new account receivable, the value of the working capital goes up. After significant negotiation, the parties agreed that the Buyer would receive working capital of $528,309. This number represents the value of the working capital which was to be received by the Buyer and is specifically referenced in the APA’s Section 2.3(a).
During the drafting of the APA, Mr. Seeman specifically removed a provision in the APA that had authorized email notice under the APA. Mr. Seeman testified that removing the email notice language followed his practice with regard to virtually all the agreements he is involved in negotiating. He testified that, in his view, email often leads to the sending of multiple drafts of the same document, so it becomes less clear which version is the final version; a paper notice removes all of this uncertainty. Mr. Seeman removed email notice as an acceptable form of notice under the APA during the negotiation process as he finds email notice to be too informal, sometimes unclear and too easily misplaced, particularly given the sheer magnitude of emails he sends and receives on a daily basis. The Court accepts this testimony as accurate regarding at least a part of Mr. Seeman’s unilateral motivation to delete authorization for email notice under the APA.
Mr. Seeman did not communicate the thoughts expressed in the previous paragraph to Mr. Bobseine during the negotiation of the APA. He did not communicate those thoughts until the Buyer’s April 4, 2013 letter (although they may be implicit in Seeman’s Actual Closing statement dated February 27, 2013). Mr. Seeman’s live testimony on these points was candid and forthright. I infer from his actions and use of email that Mr. Bobseine did not have the same thoughts and concerns regarding email as Mr. Seeman.
On numerous occasions from December 7, 2012 through July 12, 2013, the parties (including Buyer) used email to exchange information and positions about important business matters pending between and among them, both before and after the date of the APA, and extending.
I reject as a factual matter the Buyer’s contention that the Seller and the Buyer specifically agreed that email notice would not be sufficient notice under the terms of the APA and the APA was drafted to this effect. There is no credible evidence that such a term was communicated to and agreed by Mr. Bobseine. The parties’ written agreements do not preclude use of email, but are merely silent on the point. I reject the Buyer’s contention on this point, fully aware that other agreements negotiated between the Buyer and Seller, including by way of example only, the Consulting Agreement, the Non-Competition and Non-Solicitation Agreement, and the Personal Goodwill Purchase Agreement, all contain similar notice language, and do not allow for email notice.
On February 27, 2013, CA, LLC hand-delivered to the Seller an Actual Closing Statement. The delivery was untimely, not made to the proper address, nor was a copy sent to counsel under Sec. 2.3(b). Because the Buyer and the Seller were both using the same controller (Patly Flanagan), the parties agreed that the late delivery was acceptable.
The Actual Closing Statement calculated the Actual Net Assets at $1,782,648. Net of the $528,309 of working capital, this calculation fixed the excess amount alleged owed by the Buyer to the Seller of $1,254,339. Deducting the Buyer’s down payment of $492,638 in cash at closing, the Buyer calculated that he owed the Seller an additional sum of $761,701.
Seller undertook a review of Buyer’s position, and engaged the services of its outside accountant, Robert Busch, C.P.A., a partner at the accounting firm of Moody, Famiglietti&Andronico (“Busch”), to perform that review.
In a face-to-face conversation early on March 21, 2013, Seeman asked Bobseine when Buyer would receive Seller’s position on the working capital calculations. On that date, Seeman and Bobseine were working at the same office premises at 1099 Hingham Street, Suite 201, Rockland. Bobseine responded that after a *143 10:30 a.m. conference call, Busch’s work on the working capital calculation would be forwarded to Seeman.
At 10:30 a.m. on March 21, 2013, Bobseine for Seller forwarded by email to Seeman for Buyer, a series of spreadsheets and summaries prepared by Busch which concluded that Buyer owed $1,959,630 for Final Net Assets. After sending that email, Bobseine walked down the hall and told Seeman that he had delivered Busch’s work to him by email.
Bobseine realized that he had not provided Mr. Busch’s contact information, so at 10:47 A.M. he sent another email to Seeman stating “I suggest you send to your accountant and that he have a discussion with Rob Busch. Rob’s number is 978 557 5327.”
Plaintiff-Seller’s email forwarded on March 21, 2013 was stamped “ATTORNEY CLIENT PRIVILEGED AND CONFIDENTIAL WORK PRODUCT.” Soon after 10:47 A.M. on March 21, 2013, Seeman checked back with Bobseine to be sure that Buyer had Seller’s permission to read Busch’s calculations, as Busch’s forwarding email to Seller contained the words “privilege” and “work product.” Bobseine granted that permission. After sending his email, Mr. Bobseine told Mr. Seeman, in words or substance that “these things change all the time, so you never know if this is final or not.”[4] Mr. Seeman later referred to that statement by Mr. Bobseine as a “joke.”[5] The two agreed to discuss Seller’s email further during the following week (beginning Monday, March 25,2013).
Seller’s email of March 21, 2013 did not expressly state that it was a Notice being forwarded in accordance with Sections 2.3 and 11.2 of the APA. Bobseine did not so state orally to Seeman. Nor was the March 21 email copied to CA, LLC’s attorney as required by the notice provisions of Section 11.2. The email was sent to and forward from “tseeman@cutterassociates.com,” which was Mr. Seeman’s own Comcast email address. The March 21, 2013 email was not expressly addressed to the address of the Seller as identified in Section 11.2, although as an electronic document, it was accessible at that address.
On Tuesday, March 26, 2013, Seeman called Bobseine, said that he had urgent business in Chicago, and stated that he was unavailable until March 29. Seeman knew on March 26 that Bobseine was to leave for a scheduled vacation on March 29, and would not return until April 8. Seeman agreed to discuss the Final Net Assets issue on or after April 8 when Bobseine returned.
On March 29, 30 days had passed since delivery of the Buyer’s February 27, 2013 statement. After that time, Seeman knew that he was not going to receive any additional timely notice from the Seller. His concern that, with email one never knows whether you have the final version, had been met by the expiration of the time for Seller to send notice.
On or about Thursday, April 4, 2013, Seeman sent to Bobseine (who was still away on vacation) a memorandum [Ex. 5] stating (in pertinent part):
Mark, as you presumably know, you and Seller did not provide me with a 30-day written notice pursuant to Sections 2.3 and 11.2 of the [APA].
Your email to me dated March 21 does not constitute notice for many reasons, including but not limited to, (a) it does not comply with the clear and explicit provisions of the APA, (b) email notice was specifically removed from the APA as part of our drafting/negotiations, (c) you told me shortly after you sent the email that you did not think it was final, and (d) the email you forwarded from your and Seller’s accountant says that he wants to have a further conversation with you regarding it, adding weight to your statement that it was probably not final.
The memorandum continued with an explanation of the purpose of §2.3 of the APA “to achieve closure in a time-sensitive manner” and pointed out that the Seller’s email had also not been sent to Buyer’s counsel under section 11.2 of the APA. It alluded to the Buyer’s own non-compliance with section 11.2 and the APA in its February 27 notice as evidence of the importance of complying with the notice provisions of the APA. Treating the Actual Net Assets issue as settled, the memorandum reported that Buyer had wired its calculated amount of $761,701.00 to Seller’s account.
By April 4, as Seeman knew, it was too late for Bobseine to cure the alleged shortcomings within the 30 days of the Buyer’s Actual Closing Statement.
On his return from vacation, and after seeing Seeman’s April 4 memorandum, Bobseine emailed Seeman on April 8 and 9. The email pointed out their history of working well together, including the provision of an extension of the Buyer’s deadline for calculating working capital. It recounted the parties’ discussion of Mr. Busch’s analysis as emailed to See-man and the parties’ “agree[ment] to discuss the working capital issue the following week.” It urged Seeman “to return to the terms of our agreement and to sit down with our accountants to discuss the differences” and stated, “[i]f we cannot agree, then we should retain one of the accounting firms detailed in the purchase agreement.” Bobseine requested a response by April 12.
The Seller reversed the Buyer’s wire of $761,701.00 to Seller’s account, as it was a disputed amount.
Seeman emailed Bobseine on May 8, 2013, asserting that “1. . . . [t]he Seller is paying” the Seller’s expenses and that “Once this issue is gone, the accountants can step aside, and the only remaining item is the 1099s, discussed in the next paragraph.” Seeman asked Bobseine to let him know “whether we can agree on Number 1 above and proceed to Number 2 above.”
In the 30 days following Seller’s March 21,2013 email, Buyer and Seller continued to negotiate to solve the parties’ differences about the numbers, despite the Buyer’s contention (all rights reserved) that notice was improper. Among other things, they exchanged emails *144 on April 9, 10, and 17, with discussions continuing beyond the 30-day period into May, June and July. The parties’ accountants met during the 30-day period to try to resolve the dispute. Seller’s transactional counsel emailed Seeman on May 13, 2013, proposing the Independent Accountant Review.[6] The parties were unable to reach agreement on the amount of Actual Net Assets. Nor did they resolve the Seller’s request that the dispute over Net Operating Assets be referred to the Independent Accountant. To date, Buyer has maintained that the Independent Accountant review is not required. The Seller contends that the APA does require such review. In light of the Buyer’s position on Net Operating Assets and the applicability of section 2.3 of the APA, the Seller’s efforts to resolve the matter within those 30 days (and beyond) were commercially reasonable.
Aware of the Seller’s position, the above facts and the pending dispute, Cutter Associates, LLC has moved forward with its business, including putting money at risk in an attempt to expand its business and numbers of employees. In the past seven months, the Buyer has hired seven employees and intends to hire several more imminently. Buyer is launching an expensive project to create an entirely new customer website which will include expensive security features to protect confidentiality of documents. It took those actions in the belief that its position on Net Operating Assets will prevail, but aware of the dispute.
DISCUSSION
Two principal legal issues separate the parties on the applicability of the independent accountant review under §2.3 of the APA: (1) whether the Seller’s email of March 21, 2013 constituted delivery of a “notice” under §2.3(c)and§11.2of the APA and (2) whether the Seller’s email of March 21, 2013 constituted an adequate “notice” under §2.3(c). Well-settled rules of construction govern resolution of these contractual interpretation questions:
‘The interpretation of a written contract is a question of law.” Brillante v. R.W. Granger & Sons, Inc., 55 Mass.App.Ct. 542, 548 (2002). When the words of a contract are not ambiguous, the contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Sur. Co., 433 Mass. 373, 376 (2001). ‘We read the [contract] as written. We are not free to revise it or change the order of the words.” Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 147 (1984). In addition, “(a]ll parts of an agreement are to be construed together as constituting a single and consistent arrangement.” Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 282 Mass. 367, 375 (1933). We “must ‘give effect to the parties’ intentions and construe the language to give it reasonable meaning wherever possible.’ "Brillante, supra, quoting from Baybank Middlesex v. 1200 Beacon Properties, Inc., 760 F.Sup. 957, 963 (D.Mass.1991).
McMann v. McGowan, 71 Mass.App.Ct. 513, 516-17, rev. denied 451 Mass. 1109 (2008).
I.
Seeman first contends that Bobseine’s email of March 21 was not “delivered personally” to him at his address, with a copy to his counsel, as required by Section 11.2 of the APA. Properly construed, the APA does not support that contention.
In the first place, although the precedent was in place well before 2012, the parties to the APA did not choose to adopt limiting language of the type construed in McMann, 71 Mass.App.Ct. at 518. In McMann, the court held that hand delivery to the recipient’s address was insufficient, because the parties’ contract specified delivery “in hand” or by three other methods that left a paper or electronic trail. The Appeals Court’s analysis (at id.) is instructive:
In addition to delivery “in hand,” the notice provision lists three other methods that the parties could use to effectuate delivery of notice. Each of these methods (certified mail, overnight delivery, and facsimile service) provide a paper or electronic trail, thereby enabling delivery to be verified without reliance on an uncorroborated assertion by the plaintiff. See Cinder Prod. Corp. v. Schema Constr. Co., 22 Mass.App.Ct. 927, 929 (1986) (registered mail and certified mail facilitate proof of delivery of notice); Computune, Inc. v. Tocio, 44 Mass.App.Ct. 489, 493 (1998), quoting from Gerson Realty Inc. v. Casaly, 2 Mass.App.Ct. 875, 875 (1974) (“ The function of a requirement that notice be transmitted by registered mail is to provide a means of resolving disputes as to the fact of delivery of the notice.’ Delivery by Federal Express . . . serves the same function and provides the same proof of delivery as certified or registered mail”).
The court relied in significant part upon the specialized meaning that the phrase “in hand” has acquired in common legal usage.
In this case, as in McMann, the notice provision uses the disjunctive “or” in describing the four permissible methods of notice.[7] Unlike the parties to that case, the parties here chose the phrase “delivered personally” when drafting §11.2. No one suggests a common legal usage of that term. It specifies no particular mode of delivery, but does require that the item delivered actually reach the “person” intended as the recipient. That indisputably happened here. Moreover, the email created the type of electronic trail that serves the purpose of the paper trail created by the other explicitly approved methods in §11.2 of the APA (“by courier, overnight delivery service, or . . . regular mail as certified with postage prepaid”).
The Seller also points out that, in contrast to §2.3(b) (governing delivery of the Buyer’s Actual Closing Statement), the section addressing the Seller’s notice of disagreement (§2.3(c)) does not expressly require delivery “in accordance with the notice provisions set forth in *145 Section 11.2.” Section 2.3(c) simply states that “Seller may . . . deliver a notice to the Seller” with certain content (discussed below). Ordinarily different language signifies a different meaning, but I do not reach that conclusion here. Because §2.3(c) uses the word “notice,” it falls within the plain language of Section 11.2 (applicable to “[a]ny notice . . . permitted by this Agreement”) despite its omission of any reference to §11.2. Another drafting flaw in §2.3 is that it refers to delivery by the Seller of “a notice to the Seller” instead of a notice to the Buyer. The Seller, understandably, does not press the point, which, if taken literally, would result in rejection of the Buyers’ claims at the outset. Still, the odd lacunae in §2.3 suggest that the Buyer’s professed insistence on Seller’s exceedingly strict compliance with §11.2 (when he himself did not comply in February) post-dates execution of the APA. When they drafted the APA and implemented the provisions governing the Actual Closing Statement in February 2013, the parties contemplated a practical approach to delivery of notice before imposing a potential forfeiture of six-figure claims.
Second, in similar cases, the actual receipt of a notice has prevailed over technical arguments that the form of delivery did not conform in all respects with the mode described in the applicable contractual or other governing provision. Korey v. Sheff, 3 Mass.App.Ct. 266, 268 (1975); Gerson Realty, Inc. v. Casaly, 2 Mass.App.Ct. 875 (1974), quoted in McMann, 71 Mass.App.Ct. at 518.
Third, the court does not agree with the Buyer (Memo at 7) that “the Seller and the Buyer specifically agreed that email notice would not be sufficient notice under the terms of the APA, and the APA was drafted to this effect.” Any such alleged “specific! 1 agree[ment]” is expressly precluded by the integration clause of the APA §11.5.[8] Moreover, the court does not find a meeting of the minds on that point. Even on March 21, Mr. Seeman agreed to discuss the matter the following week, leading Mr. Bobseine to believe, reasonably, that his email qualified under the APA’s personal delivery language. Mr. Seeman did not convey his concerns about use of email to the Seller during negotiation of the APA or, indeed, until April 2013. During negotiation over the APA and through the expiration of his 30-day response period, Mr. Bobseine had no reason to know of Mr. Seeman’s later-expressed views on email and therefore did not assent to them.
The removal of the references to email might bear upon interpretation of section 11.2 if the language were ambiguous. The phrase “delivered personally” is not ambiguous as applied to an email actually received by the addressee. “Personally” means “with the personal presence or action of the individual specified ... used to indicate that a specified person and no other is involved in something . . .” Concise Oxford American Dictionaiy at 660 (Oxford University Press 2006). Mr. Seeman received the email by his own action and without involvement of others. “Delivered” means “bring and hand over” (id. at 239) and, more importantly — as English speakers accustomed to using the internet know — is commonly used to refer to the successful arrival of an email at the specified email address.
Plugging the phrase “email delivery” into any internet search engine easily proves the point. Moreover, “deliver” is used to refer to email delivery in the standard footer present in virtually all emails used by the parties in this case (“If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone”). Imagine, for instance, trying to construe the word “deliver” in that context as not referring to electronic delivery. No one can reasonably suggest that the message condones forwarding an inadvertently addressed email as long as the recipient uses electronic rather than physical means.
Fourth, the parties in this case routinely communicated by email. See, e.g. Exhibits 4, 7 and 8. Addressing a question raised by the court at oral argument, the plaintiff asserts that email notice also constitutes sufficient written notice under the Massachusetts Uniform Electronic Transactions Act, G.L.c. 110G, §8(a), which provides in relevant part:
... if parties have agreed to conduct a transaction by electronic means and a law requires a person to provide, send or deliver information in writing to another person, the requirement is satisfied if the information is provided, sent, or delivered ... in an electronic record capable of retention by the recipient at the time of receipt. . .
See also Feldberg v. Coxall, 30 Mass. L. Rptr. 150 (Mass.Super.Ct. 2012). The statute addresses the separate issue of what constitutes a “writing.” The parties agree that the March 21 email met the “writing” requirement of Section 11.2. In any event, the volume and importance of the transactions that the parties conducted by email over many months through March 21, 2013 (and thereafter) confirm their agreement to conduct their transactions by electronic means within the meaning of §8(a) and G.L.c. 110G, §5 (agreement “is determined from the context and surrounding circumstances, including the parties’ conduct”). The removal of email notice from §11.2 during negotiations is consistent with the requirement that the notice be “delivered personally,” but does not otherwise negate the agreement to conduct business by electronic means. That is, as long as the email was delivered personally to Mr. Seeman, it was a “writing.”
Perhaps the greater significance of c. 110G is its affirmation of the use of electronic communication in modern legal and business transactions. The APA’s phrase “personal delivery” encompasses the modem practice of conducting business both by electronic means and in hard copy. Given prevailing expectations about use of electronic media in business and private matters today, if a party wishes to exclude email *146 communications, he cannot do so by an after-the-fact, narrow (and unexpected) construction of contract language that permits notice by “personal delivery.”
Fifth, the issue of failure to forward to Buyer’s counsel raises a separate issue. Section 11.2 requires delivery to counsel of a “copy (which shall not constitute notice).” The parenthetical expressly precludes treating notice to counsel as sufficient. It strongly implies that notice to counsel was for convenience only. As such, the parties never intended that failure to provide a copy to counsel would be a precondition to validity of notice. Indeed, Seeman himself failed to copy Seller’s counsel on his Actual Closing Statement. It would have been an extraordinarily simple matter for Seeman to forward Bobseine’s email to counsel, or to remind Bobseine to do so.
I conclude that the remedy for failure to notify counsel may include extension of time for response or other relaxation of requirements for the receiving party, but does not include forfeiture of all right to challenge the Buyer’s Actual Closing Statement. Cf. Hague v. ExxonMobil, 2010 WL 4070277 (Mass.Super.Ct. 2010) [27 Mass. L. Rptr. 363], at part B (excusing defendant from 30-day notice requirement where plaintiff failed to comply with contractual requirements for “personally delivering” a notice of change of address).
II.
Seeman also asserts that the Buyer’s March 21 email did not satisfy the requirements of Section 2.3(c), which allows the Buyer 30 days after delivery of the Actual Closing Statement to “deliver a notice to the Seller [sic: Buyer] stating that the Seller disagrees with such calculation and specifying in reasonable detail those items or amounts as to which the Seller disagrees and the basis therefor.” There is no contractual requirement that the notice contain any particular language or refer specifically to §2.3. The Buyer’s arguments regarding the absence of such references therefore are not persuasive, particularly in a context where the two people involved worked down the hall from each other and specifically discussed the Buyer’s expectation that the Seller would respond in some fashion to the Actual Closing Statement.
The Buyer next argues that the March 21 email did not qualify as notice under §2.3(c) because, joking or not, Bobseine expressed some lack of certainty as to whether it was final or not. Seeman was certainly reasonable in viewing the exchange as a “preliminary email,” in withholding action, in postponing analysis at that time, and in instructing his accountant not to start work. At the same time, Bobseine did not promise another notice; a revised notice was just a possibility. Accordingly, time would tell whether, in words used by Seeman on the stand, the email was “final or not.”
When the Seller’s 30-day response period expired on March 29, Seeman knew that another notice would not be sent — at least not in timely fashion. Given the protection provided by the 30-day deadline, the March 21 notice became final on March 29 as far as the APA was concerned. Waiting for another notice was no longer a reasonable approach for Seeman to take once March 29 passed. If Seeman had doubts, he could have checked with Bobseine. Nothing in the APA allows Seeman, an independent accountant, or the court to ignore a notice based upon Bobseine’s by-then-obsolete statement that another notice might be forthcoming.
Finally, the Buyer argues that the March 21 email did not contain the content required by §2.3(c), because it “fails to specify ‘in reasonable detail those items or amounts as to which the Seller disagrees and the basis therefor.’ ” Def. Prop. Findings, OT34-39. Bobseine’s emails of 10:30 and 10:47 A.M. on March 21 forwarded his accountant’s:
. . . calculation of net assets based on the information provided by Patty [Flanagan] and Purchase and Sales Agreement. I used the Buyer’s calculation as a starting point and provided an explanation of my adjustments to the calculations. I also pulled together a reconciliation of actual net assets delivered at closing compared to the net asset calculation per the Purchase and Sale Agreement.
I also tied out significant balance sheet accounts to supporting documentation including cash activity, deferred revenues, etc.
The attachment, entitled “Cutter Associates net Asset Calculation Review.xlsx” set forth a description of each line item, totals, seller adjustments, adjusted totals and a reconciliation, as well as four footnotes entitled “explanation of seller adjustments.” The footnotes generally describe the data reviewed, the party who paid (or assumed) the liabilities and who did not. The spread sheets stated that the calculations were “[c]omputed using Patty Flanagan’s 2.22.13 figures.” As Buyer pointed out through cross examination, the attachment did not include explanations of, for instance, why the Seller believed that the controlling documents required the Buyer to assume the liabilities at issue.
There is little question that the March 21 email and attachment provide reasonable detail establishing “those items or amounts as to which the Seller disagrees.” The dispute centers on whether they also “specified] in reasonable detail... the basis therefor.” Much of the Buyer’s argument focuses upon Mr. Bobseine’s inability on the stand to state why the Buyer should bear the various costs at issue. That is largely beside the point. The March 21 email and attachment stand on their own. Its contents either meet or fail to meet the “basis therefor” requirement because of what the email says or omits.
The APA did not define what the parties meant by “basis.” The context shows that they meant to require provision of sufficient information to allow their own accountants, as well as the independent accounts, to determine whether the Actual Net Assets calculation was accurate and, if not, to calculate the correct amount. Section 2.3(a) specifically defines “net assets” and incor *147 porates the “methodology used in preparing Seller’s audited balance sheet as of December 31, 2011 and with GAAP consistently applied.” It also requires calculation of Net Assets “after the payment of all transaction expenses attributable to Seller ... all back wages . . . any loans owed to shareholders, any accrued transaction related or ‘stay’ bonuses being paid to employees, and any termination or settlement payments.” The court construes “basis” in §2.3(c) as requiring sufficient information to determine whether or not the line items at issue fall within these definitions, in conjunction with whatever additional submissions the independent accountant may require, request or permit.
The March 21 email appears to meet that test. It identifies the nature and amount of each expense, states who paid it (or assumed liability therefore) and who did not. It appears that an accountant, applying the referenced methodologies, could determine how to account for each line item, so described. If not, the independent accountant is best situated to state how the information is insufficient. If the Seller has provided an insufficient basis it may lose its argument. In such a technical area, where the parties have opted for expert review, rather than decision by a court on accounting issues, the court would be outside its area of legal expertise and premature, in any event, in concluding that the information provides an insufficient “basis” to permit completion of the independent accountant review.
Nothing in §2.3 requires the kind of narrative rationale that the Buyer appears to demand. The word “basis” means “the underlying support of foundation for an . . . argument.” Concise Oxford American Dictionary at 68. It does not include the argument itself. By analogy, this Court’s Standing Order l-09(l)(c)(9) defines “state the basis” as requiring identification of the essential acts or omissions, identifying witnesses and participants and identifying supporting documents. This definition, too, stops short of demanding the party’s argument or rationale.
It follows that the March 21 email contained sufficient substance to qualify as a notice under §2.3(c).
III.
The defendant asserts that the plaintiff has waived any right to the independent accountant review under §2.3.1 reject those defenses.
The amended complaint (at 1-2, Count I and Prayer for Relief 5) includes a request that the court order independent accountant review under the APA. The independent accountant review generates “a report setting forth” the accountant’s calculation, which “shall be final and binding upon the Buyer and the Seller, shall be deemed a final arbitration award that is binding on the Buyer and the Seller, and neither the Buyer nor the Seller shall seek further recourse to courts or other tribunals, other than to enforce such report.” The amended complaint also asks the court to enforce the accountant’s report, once issued in the future. The reference to a “final arbitration award” brings this case •within G.L.c. 251, §1, which empowers the court to enter an order compelling arbitration under a written contract for arbitration. See Unisys Finance Corp., v. The Allen R. Hackel Org., Inc., 42 Mass.App.Ct. 275, 280 (1997).
The fact that the amended complaint also pleads unjust enrichment, breach of contract and other causes of action does not waive the independent accountant review. Parties are entitled to plead in the alternative. Mass.RCiv.P. 8(e)(2). Section 2.3 bars resort to court only if a parly “seek[s] further recourse.” It would be one thing if the defendants agreed upon the availability of the non-judicial forum. They have, however, asserted that §2.3 does not apply. If the defendants prevail on that point, then this case does not constitute “further recourse,” but the sole available forum. Pleading to account for the possible success of the defendants’ argument does not amount to waiver in such circumstances.
Nor has the plaintiff waived the independent accountant review by failure to comply with its obligations “during the 30 days” following delivery of the March 21 notice. It engaged in commercially reasonable discussions during that period. The APA does not require invocation of the independent accountant review until “promptly thereafter.” See § 11.2(d). No later than May 13, plaintiffs counsel suggested pursuing that avenue. Given the state of negotiations and the defendants’ contention that they had no duty to treat the March 21 email as proper notice, the May 13 request was prompt.
Because Seller complied with §2.3(c), the Buyer was obliged to cooperate in the Independent Accountant Review, but has refused to do so, the plaintiff is entitled to judgment on count I against the only other party to the APA, namely CA, LLC. Seeman is not a party to Count I and therefore is not subject to that ruling in his individual capacity.
IV.
Finally, the plaintiff seeks a preliminary injunction as requested under Prayers 3, 4, 5, and 6 of the Amended Verified Complaint as stated in the Plaintiffs Amended Motion for Injunctive Relief filed on September 3, 2013 (“PI Motion”). To the extent that the PI Motion seeks relief aimed at accomplishing the independent accountant review, the Court’s entry of final relief on that issue obviates the need for preliminary relief.
The PI Motion also seeks an order that the defendant shall not spend, pay or transfer any sums other than in the ordinary course of business and shall hold the amount of $1,780,893 in constructive trust.
A party seeking a preliminary injunction must prove a likelihood of success on the merits of the case and a balance of harm in its favor when considered in light of the likelihood of success. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). “Economic harm alone . . . will not suffice as irrepa *148 rabie harm unless ‘the loss threatens the very existence of the movant’s business.’ Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987).” Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 227-28 (2001).
The plaintiff has shown a likelihood of success in obtaining independent accountant review and in recovering the uncontested amount of $761,701. The relative merits of the parties’ positions regarding recovery in excess of that amount depends upon a battle of experts. Both sides have plausible arguments. The court is not in a position to find that the plaintiffs likelihood of success greatly exceeds the defendant’s chances on the merits.
The balance of harms, however, does not favor the plaintiff. The plaintiff alleges economic harm alone. It has not shown that the defendant lacks assets to pay a judgment, if the independent accountant rules in favor of the Seller. Nor has it shown a threat to its viability as a business. This is therefore not a situation where “preliminary relief appropriate because a ’’recoverable monetary loss may constitute irreparable harm where the loss threatens the very existence of the movant’s business." Cf. Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Company, 399 Mass. 640, 643 (1987). Nor will this case, once addressed by an independent accountant, likely involve a “time consuming and sometimes difficult task of trying to exact [a party’s] damages.” Boston Athletic Association v. International Marathons, Inc., 392 Mass. 356, 362 (1984). The task is likely to be simple, requiring nothing more than reviewing the numbers stated in the accountant’s report.
On the other hand, lying up substantial assets of the defendant until the entire case is adjudicated on the merits will harm the defendant and could impair its ability to do business in the most advantageous manner.
The PI Motion is therefore DENIED because the balance of harms does not favor the plaintiff.
CONCLUSION
For the above reasons, it is hereby ORDERED AND ADJUDGED:
1. Judgment on the merits shall enter for the plaintiff on Count I of the Amended Verified Complaint against the only defendant on that count, namely Cutter Associates, LLC;
2. Pursuant to §§2.3(d) and 2.3(g) of the parties’ Asset Purchase Agreement dated December 17, 2012, the defendant Cutter Associates, LLC shall promptly join with the plaintiff in causing a mutually agreeable independent accounting firm (including but not limited to Grant Thornton LLP or BDO LLP) to review the parties’ Asset Purchase Agreement dated December 17, 2012 (“APA”) and the disputed items or amounts (set forth in the Buyer’s Actual Closing Statement dated February 27, 2013 and the Seller’s email dated March 21, 2013 and attachments) for the purpose of calculating Actual Net Assets under the APA. The defendants shall take all actions necessary to authorize, enable and support that review, including executing a reasonable engagement letter, if requested; and cooperating with the Independent Accountant and promptly providing all documents and information requested by the Independent Accountant.
3. All proceedings in this case are stayed pending completion of the Independent Accountant Review.
4. The parties shall report on December 20 and eveiy 4 months thereafter regarding completion of the Independent Accountant Review.

Prayer 5 requests: “that Defendants and their agents, employees and affiliates and anyone acting on behalf of any of them, be mandatorily enjoined to cooperate forthwith in causing and enabling the review by an Independent Accountant provided for in Section 2.3(d) of their Asset Purchase Agreement with Plaintiff dated December 17, 2012.”

implicit in that decision was also a decision to bifurcate trial on the merits pursuant to Mass.RCiv.P. 42(b), because trial of the applicability of Section 2.3 would promote efficient resolution of the case, where a ruling on that issue had the potential to moot or at least greatly modify resolution of the other claims.

The Court’s intention is to adopt this portion of the parties’ agreed facts verbatim. Any deviations are typographical errors in transcription.

See official JAVS recording of the trial on September 16, 2013 at 3:06:10 P.M. No transcript is yet available to the court or the parties. The court has listened to the recording of that trial session, because the defendants’ proposed findings of fact (and Seeman’s April 4 letter, quoted below) paraphrase Mr. Seeman’s twice-stated testimony about Mr. Bobseine’s March 21 statement regarding finality quite differently and, it turns out, incorrectly (unless one looks at the defendant’s less spontaneous and less reliable written statements).

See official JAVS recording of the trial on September 16, 2013 at 3:18:05 P.M.

The defendants’ objection to consideration of that document on the basis of privilege and settlement negotiations is overruled. The document was already admitted into evidence, waiving objections. Moreover, the proposal to go to the Independent Accountant was not an offer of consideration in settlement, but an operative fact and invocation of a right under a contract, supported by different consideration when the APA was signed. See Mass Guide to Evid., §408. It is not offered for the purpose of proving liability, invalidity or amount of a claim, but to establish compliance with a prerequisite for relief. Id.

Construing “delivered personally” to include emails actually delivered to the specified recipient does not render the other methods specified in the APA meaningless, as Buyer contends (Def. Trial Brief at 8). The other three methods of delivery allowed by §11.2 allow the sender a choice between methods that are “deemed” to provide notice at the times specified in that section without need to prove personal receipt. See PI. Legal Authorities, pp. 3-4 citing, e.g. Grimm v. Venezia, 2011 WL 7982163; 29 Mass. L. Rptr. 616 (Mass.Super.Ct. 2011).

That clause reads in relevant part: ‘This Agreement and the documents referred to herein constitute the entire agreement among the parties pertaining to the subject matter hereof and thereof, and merge all prior negotiations and drafts of the parties regard to the transactions contemplated herein and therein. Any and all other written or oral agreements existing between the parties hereto regarding such transactions (i) are expressly cancelled [immaterial exception omitted] . . . and (ii) are not intended to confer upon any other person any rights or remedies hereunder.”